# UNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        vs.<br><br>DAVID SOMPET POWERS (1), KEONI<br>TIMOTHY BISCHOFF (3),<br><br>        Defendants. | 1:21-CR-00008-TMB-MMS<br><br>**SUPERSEDING INITIAL REPORT<br>AND RECOMMENDATION ON<br>MOTION TO SUPPRESS [614]** |

## I.    MOTION PRESENTED

The first superseding indictment, filed in March of 2022, charges David Sompet Powers ("Powers") and Keoni Timothy Bischoff ("Bischoff") with one count of drug conspiracy,[1] one count of possession of firearms and silencers in furtherance of drug trafficking,[2] one count of possession of a machinegun in furtherance of drug trafficking,[3] and two criminal forfeiture allegations.[4] *See*, Dkt. 230. Mr. Powers was also charged with one enhanced penalties allegation.[5]

Mr. Powers moved to suppress the evidence resulting from the search of Janel Lynn Davis's ("Davis") iPhone. Dkt. 614. He argued (1) that he has standing to assert a privacy

---

[1] 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A)(B) and (C).
[2] 18 U.S.C. §§ 924 (c)(1)(B)(ii) and 924(c)(1)(A)(i) and (ii).
[3] 18 U.S.C. §§ 924 (c)(1)(B)(ii).
[4] 21 U.S.C. § 853, 18 U.S.C. § 924(d)(1), 28 U.S.C. § 2461(c) and Rule 32.2(a).
[5] 21 U.S.C. § 841(b)(1)(A).

interest in Ms. Davis's iPhone; (2) that the search warrant for the iPhone was deficient for material omissions and inaccuracies under *Franks*; (3) that law enforcement's decision to seek the search warrant was influenced by its unlawful pre-warrant searches of the iPhone; (4) that law enforcement's conduct throughout the investigation evidences a series of bad faith actions that merit the sanction of suppression; and (5) separately, that the search warrant was insufficiently specific under the Fourth Amendment. *See generally, id.*

The government responded in opposition. Dkt. 639. It argued that Mr. Powers did not have standing to challenge the search of Ms. Davis's iPhone, and it also summarily disagreed with the merits, though the primary focus of the response was standing. *Id.* Mr. Bischoff moved to join the motion, but did not substantively argue the matter. Dkt. 637.

This Court held an evidentiary hearing over three days. Dkts. 699, 706, 709 (collectively, "Tr.").[6] Over the course of these proceedings, this Court heard from eleven witnesses, including a defense expert witness and Mr. Powers, and it admitted and reviewed dozens of exhibits. Upon this Court's review of the case law, the parties' briefs, the witness' testimony, the admitted exhibits, and upon consideration of the oral arguments made by counsel, this Court hereby issues its Superseding Initial Report and Recommendation regarding Mr. Powers's Motion to Suppress. For the reasons below, the Motion to Suppress should be **GRANTED** as to Mr. Powers and **DENIED** as to Mr. Bischoff. 28 U.S.C. § 636(b)(1)(B).

---

[6] The page numbers in these documents are sequential. For ease of citation, this Court will cite to these documents as one.

This Court's recommendations are based on the following findings: (1) Mr. Powers has standing to pursue his claim of privacy in Ms. Davis's iPhone because his use of the cellphone indicated a common ownership and control sufficient to demonstrate that he had a reasonable and legitimate expectation of privacy in the cellphone; (2) Juneau Police Department ("JPD") officials unlawfully searched Ms. Davis's iPhone prior to obtaining a search warrant, and the government has not met its burden to show that the decision to seek the search warrant was not influenced by the discoveries made therein; and (3) that law enforcement repeatedly and flagrantly violated both Ms. Davis's and Mr. Powers's constitutional rights, amounting to a pattern of bad faith that should be deterred by the sanction of suppression. As to Bischoff, this Court finds that he does not have standing to challenge the search of the iPhone. This Court does not reach the merits of whether the search warrant was unconstitutionally overbroad. This Court does not find that *Franks* is applicable.

## II.    EVIDENTIARY PROCEEDINGS

### Janel Lynn Davis

This Court first heard from Ms. Davis. She began her testimony by discussing her romantic relationship with Mr. Powers, which dated back to 2017.[7] She testified that she had been living with Mr. Powers since at least early 2019, and that while she was still legally married to someone else, she was in an exclusive relationship with Mr. Powers.[8]

---

[7] Tr. at 14:15–21.
[8] *Id.* at 14:22–15:15.

Her testimony turned to her iPhone. Mr. Powers paid for her to get a new phone, though she had inserted her old SIM card into it.[9] She testified that she did not have a passcode on her phone, but that was because Mr. Powers had difficulty remembering it, so she decided not to have one to make it easier for him to access the cellphone.[10] Mr. Powers was allowed to use the phone whenever he wanted to, he had authority to decide what contents of the phone Davis could show to others, and that he had joint control of it.[11] Ms. Davis was asked questions about an extraction of select online searches made from the phone.[12] Ms. Davis answered that Mr. Powers made certain searches on her phone, as he was permitted to do so. Ms. Davis and counsel then painstakingly and thoroughly walked through dozens of searches related to pornography, online shopping, and vehicle parts that she confirmed were made by Mr. Powers from April to May of 2020.[13] Mr. Powers separately confirmed that he made these searches, summarized *infra*, and this Court believes that Mr. Powers used the iPhone for both personal and professional purposes.

Ms. Davis then testified to other contents on her phone, including sexually explicit materials of just her and Mr. Powers.[14] These included videos taken from her iPhone by Mr. Powers, that were intended to be viewed only by Ms. Davis and Mr. Powers.[15] Ms. Davis was also asked about surveillance footage, not on the iPhone, that reflected her and

---

[9] *Id.* at 16:18–25.

[10] *Id.* at 17:1–20.

[11] *Id.* at 17:18–19:6.

[12] *Id.* at 20:16–18; Defendant Powers' Exhibit ("DP-") 36G.

[13] *See*, Tr. at 20:19–31:10; *see also*, DP-36G rows 1–49.

[14] Tr. at 31:11–32:15.

[15] *Id.* at 32:19–23 (she would "[a]bsolutely not" "show those videos to anyone other than David Powers[.]").

Mr. Powers engaging in sexual acts wherein Mr. Powers would regularly use her iPhone for stretches of time.[16]  Ms. Davis testified that the two would routinely use each other's cellphones as depicted in the footage.[17]

She was briefly questioned by the government.  She answered questions about the legal nature of her relationship, why her legal name was still Davis (she has had difficulty changing her name with the Social Security Administration while in custody), the age of her Apple and AT&T accounts, her prior drug usage, and the applications on her phone and Apple account.[18]

### David Powers

Mr. Powers testified.  His testimony was consistent with Ms. Davis's regarding their relationship, confirming that it begun around 2017, that they lived together, that he purchased the cellphone for Ms. Davis, that he would use it as his own whenever he wanted to, and that he would expect Ms. Davis to not share any private materials stored on the cellphone.[19]  He then confirmed Ms. Davis's testimony regarding the forty-nine web searches from the phone, which included both personal (pornography-related) and professional (vehicle parts) searches ranging from April 9, 2020 to May 4, 2020.[20]  He also confirmed, and this Court is persuaded by this testimony, that he was personally outraged by the government searching and disseminating the contents of the phone (including videos

---

[16] *Id.* at 32:25–35:20.
[17] *Id.*, *see also*, DP32–35 (admitted via stipulation).
[18] *See generally* Tr. at 40:7–60:7.
[19] *Id.* at 409:8–411:20.
[20] *Id.* at 412:2–423:14.

of sexual activity between himself and Ms. Davis) because he expected such matters to remain private.[21]  He also confirmed that the surveillance videos accurately depicted how he would typically use her phone.[22]

The government asked him questions regarding potentially inculpatory matters on the phone, such as drug and firearm possession, about whether he could expect privacy in a phone if it did not have a passcode on it, and about his history with drugs.

**Benjamin Beck**

This Court heard from Sergeant Benjamin Beck ("Beck").  Beck responded to the Fred Meyer's parking lot in Juneau on May 6, 2020 after JPD received an anonymous tip that a woman, who the caller believed to be named Janel, had been handing out bags in a "sketchy" way.[23]  He first heard of the matter from the police radio noting that there may have been an active drug deal, which he thought was "silly" to air, as the public can access that radio.[24]  Beck had no information on the tipster and did not take any steps to corroborate the information before parking his patrol vehicle directly behind Ms. Davis's green Ford Ranger.[25]  Body camera footage indicates that Beck's patrol vehicle was about one vehicle's length behind the Ford Ranger, construed generously in favor of the government's position, that a blue Chevy was parked to Ms. Davis's right, and that a sedan

---

[21] *Id.* at 423:18–429:3.
[22] *Id.* at 429:4–430:14.
[23] *Id.* at 370:24–371:13.
[24] *Id.* at 371:13–22.
[25] *Id.* at 372:2–375:15.

was parked in front of her.[26]  While Beck disputed that he was immediately behind her vehicle, he largely agreed with the above description of the parking situation.[27]

Beck spoke to Ms. Davis, who was understandably anxious about the encounter, but did not appear to this Court to exhibit excessive nervousness..[28]  After confirming her identity with her driver's license, at which point he agreed that she was detained, he called Detective Wise to perform a K-9 sniff of the Ford Ranger and the Chevy.[29]  Beck did not believe that Davis was armed or dangerous, but he suspected drug use, so he wanted to ensure that she did not have any needles on her person, so he asked her to step out of the vehicle, and she complied.[30]  He and Officer Hoffman were present and they performed a search of her person.[31]  The body camera footage reflects Beck and Officer Hoffman not patting Davis down, but instead, immediately checking within her coat pockets.  *Id.*

---

[26] *See*, DP1 at 00:00–1:00.
[27] Tr. at 375:16–23.
[28] *See, e.g.*, DP2 at 0:00–1:30.
[29] Tr. at 376:2–14.
[30] *Id.* at 376:15– 377:12.
[31] DP1 at 10:30–11:00.



<sup>32</sup>

Beck admitted that this was "probably not" a pat-down, but he defended his choice by explaining that large or "poofy" jackets can conceal dangerous items, so he indicated that he believed that this was reasonable.[33] Upon this search, a small bag that contained under a gram of methamphetamine was discovered.[34]

The body camera footage reflects that after searching in Ms. Davis's pockets, Beck and Officer Hoffman handcuffed Ms. Davis and sat her in the back of the patrol vehicle.[35]

---

[32] *Id.* at 10:53 (depicting Officer Hoffman and Sergeant Beck looking inside of Ms. Davis's pockets without a pat-down).
[33] Tr. at 377:17–378:20.
[34] *Id.* at 378:21–380:15; DP226.
[35] DP1 at 12:00–13:00.

Subsequently, the two patted down Ms. Lindoff and Mr. Jerue, occupants of the blue Chevy.[36] While the pat down of Ms. Lindoff is difficult to see, the body camera footage reflects Officer Hoffman reaching into the pockets of Mr. Jerue's loose-fitting shorts without first patting him down. *Id.*

After the K-9 sniff, Mr. Jerue gave consent for law enforcement to search his vehicle with the understanding that law enforcement would simply apply for a search warrant otherwise.[37] Therein, a "dime bag" then suspected of containing heroin was found.[38] This was a small amount of heroin, weighing 0.31 grams.[39] Both vehicles were taken to the Juneau police station.

Beck subsequently applied for and obtained three search warrants: one for Ms. Davis's person, one for the Ford Ranger, and another for the Chevy.[40] He averred that Ms. Davis's eyes were wide, that she was very nervous, and that her hands were visibly shaking.[41] He defended these representations, but a review of the body camera footage does not support his characterization.[42] He also represented that Ms. Davis was rapidly smoking a cigarette, but he admitted that the footage does not reflect that statement being accurate.[43] He also averred that he discovered what he believed to be a straw or pipe in her pocket that he suspected was drug paraphernalia, but the photo of the contents of her

---

[36] *Id.* at 13:00–14:30.
[37] *Id.* at 36:30–37:00.
[38] *Id.* at 37:30–38:45.
[39] DP226.
[40] Tr. at 380:17–20.
[41] *Id.* 380:21–382:4.
[42] *Id.* at 381:6–382:4; DP2 00–1:45.
[43] Tr. at 382:6–19; DP3 at 0:00–1:15.

pocket did not appear to have such an item, though he defended his position by referencing an unopened candy piece, apparently mistaking it for a lollipop, but it did not appear to have a stick, so that explanation did not make sense either.[44]  He also averred to the K-9 not reacting after sniffing, but he did not mention that the driver's side window was down.[45]  He said that he could "understand how you could feel that would be misleading or anyone could feel that would be misleading[,]" but that was not his intention.[46]  He also told the judge that Ms. Davis had "quite a bit of money on her," and it was "at least a couple [ ] hundred dollars."[47]  Ms. Davis only had about $162 USD on her person.[48]  Ms. Davis was brought to the Juneau Police Station and released later that day.

### Lee Phelps

This Court also heard briefly from JPD Sergeant Lee Phelps ("Phelps").  Phelps also responded to Fred Meyer's parking lot on May 6, 2020.[49]  The focus of his testimony pertained to him gathering the Chevy occupants to prepare for the K-9 sniff.[50]  Responding to Officer Hoffman's direction, Ms. Lindoff opened the driver's door to the vehicle and took control of her dog.  *Id.*  Officer Hoffman had his hand on the door to hold it open as she did this, and Officer Hoffman then closed the door for her.  *Id.*  Phelps objected, having Officer Hoffman open the door and leave it ajar.  *Id.*  Officer Hoffman voiced his concern

---

[44] Tr. at 383:13–384:14; DP15.
[45] Tr. at 384:15–25; DP10 at 11:30–11:55.
[46] Tr. at 385:1–13.
[47] *Id.* at 385:14–22; DP10 at 16:30–17:05.
[48] Tr. at 386:6–8; *see also*, DP20 at 31 (not admitted into evidence, but considered for its consistency with the testimony).
[49] *Id.* at 198:18–20.
[50] *Id.* at 200:21–201:24; DP1 at 16:55–17:50.

about rain getting inside the vehicle, but Phelps was unconcerned, instead whispering[51] something to Hoffman. *Id.*

**Michael Wise**

This Court heard from Detective Michael Wise ("Det. Wise"). Det. Wise was the affiant for the search warrant at issue in this motion to suppress. He conducted the K-9 sniff of the vehicles on May 6, 2020 in the grocery store parking lot.[52] The K-9 was trained to indicate on cocaine, methamphetamine, and heroin.[53] One issue in this case is whether it was improper to omit that a window on the Ford Ranger was down when explaining the dog's non-reaction after circling twice. Det. Wise evaded the question, answering unpersuasively that he could not say whether a dog would be more likely to detect the presence of controlled substances from the outside of a vehicle with its windows down, rather than up.[54] While counsel for the Defendant could have asked more exacting questions, these answers did not reflect well on the witness.

Det. Wise also testified to the search warrant. He clarified that the warrant was signed at 12:05 P.M., May 8th, rather than 12:05 A.M., that the phone was extracted on May 12th at 9:33 A.M., and that it was ultimately his choice as the lead investigator to apply for the search warrant to search for evidence of drug sales.[55] He also stated that he had discussed his decision to obtain a warrant with other law enforcement officers, but he

---

[51] This is inaudible.
[52] Tr. at 105:15–22.
[53] *Id.* at 105:23–24.
[54] *Id.* at 106:6–22.
[55] *Id.* at 107:12–110:8.

could not remember any specifics, though he stated that such conversations contributed to his overall decision to obtain the warrant.[56]

He was asked about the iPhone chain of custody report. While the iPhone was obtained on May 6, 2020, the first entry on the chain of custody report is at 4:26 P.M. the following day.[57] Det. Wise offered no explanation other than it just could take that long sometimes, though he speculated that it may have been put into a locked storage box but not logged until later.[58]

On May 8th at 12:05 P.M.,[59] Det. Wise obtained a search warrant for Ms. Davis's iPhone.[60] Before giving the cellphone to Det. Taylor to extract it, Det. Wise had looked through the iPhone himself, beginning with Mr. Powers's text messages with Ms. Davis, though he could not remember why.[61] Counsel for Mr. Powers asked Det. Wise repeatedly why and if he had prior knowledge of Mr. Powers, each time, resulting in a denial or that he did not recall.[62]

His testimony then turned to the substance of the Cellebrite report. He was asked what the process is to ensure that such a report was within the scope of a search warrant, but he only answered that he would receive the report from the forensics detective and "look[ ] through the cell phone for what [he] asked for from the judge."[63] Defendant's

---

[56] *Id.* at 110:9–111:8.
[57] DP14.
[58] Tr. at 111:22–112:13.
[59] The search warrant has "A.M." circled, but that was an error. Tr. at 108:18–109:9.
[60] DP13.
[61] Tr. at 125:1–20.
[62] *Id.* at 126:2–135:9.
[63] *Id.* at 137:8–20.

counsel then walked through various categories found within the Cellebrite report and compared it side-by-side with the search warrant, asking whether such categories were found in the search warrant, and Det. Wise agreed that at least some of the categories were not within the search warrant.[64] Det. Wise proffered that he would have asked for any categories that he wanted during his telephonic affidavit with the issuing judge. *Id.* However, upon review of the audio, it appears that he did not orally request categories outside of what was on the face of the warrant.[65]

As to the chain of custody of the iPhone, Det. Wise testified that it appeared that he had checked out the iPhone on May 8th, and he agreed that the Cellebrite extraction occurred on May 12th.[66] He answered that the normal protocol would have been to put the cellphone in the forensics room, and it should have been there.[67] He was not able to explain why the cellphone had a location entry at midnight of May 12th several miles from the police station, explained in more detail *infra*.[68]

Det. Wise was then asked about one of his representations during his telephonic affidavit for the search warrant. Det. Wise averred that Ms. Lindoff, an occupant of the Chevy parked next to Ms. Davis, had told him that she knew that Ms. Davis sold drugs and that she was going to try to find out if Davis had drugs at that time.[69] Counsel then played

---

[64] *Id.* at 138:5–142:25.
[65] *See*, DP11 at 8:30–10:00; DP 12 at 0:00–2:10.
[66] Tr. at 146:5–14; DP14.
[67] Tr. at 146:15–25.
[68] *Id.* at 148:7–151:2.
[69] *Id.* at 151:3–14.

body camera footage from Officer Hoffman, which is over forty-seven minutes long.[70] This footage does not include Ms. Lindoff making such a statement to Det. Wise, and in fact, it reflects her consistently denying being there to buy drugs. *Id.* At the end of the footage, Det. Wise answered that by that point, Ms. Lindoff had not made the incriminating statement to him, admitting that she had maintained her denial up to that point.[71] Det. Wise also answered that he had not put Ms. Lindoff's statement in his report, but he said that "[i]t was just an oversight apparently."[72] Counsel then asked: "And so your testimony is, then, at some point after all of the body cams have been shut off, after -- for 47 minutes she's been sticking to her story, she suddenly decides to tell you she was there to buy drugs?"[73] He answered, "Yes."[74] Counsel asked further, "Even though you told the magistrate that she told it to you as you arrived on the scene?"[75] He again answered, "Yes."[76]

### Elizabeth Lindoff

This Court heard from Elizabeth Lindoff, occupant of the Chevy parked next to Ms. Davis on May 6, 2020. Her testimony was brief, answering only that she did not tell any officer on May 6th that she knew that Ms. Davis was selling drugs or that she was there to

---

[70] DP1.
[71] Tr. at 161:3–18.
[72] *Id.* at 161:23–162:8.
[73] *Id.* at 162:9–12.
[74] *Id.* at 162:13.
[75] *Id.* at 162:14–15.
[76] *Id.* at 162:16.

find out if she was selling drugs.[77]  After a brief cross examination focusing primarily on her prior drug use and its effect on her perception, she was excused.[78]

**Vehicle Search Witnesses**: **Carl Lundquist, Dominic Branson, Norman Carson**

This Court heard from individuals who searched the Ford Ranger: Detective Carl Lundquist ("Lundquist"), Sergeant Dominic Branson ("Branson"), and retired Alaska State Trooper Norman Carson ("Carson").  Det. Wise appears to have been present as well.[79]

During the search, Ms. Davis's iPhone was discovered.[80]  The iPhone was photographed by Det. Lundquist, and the phone's timestamp was about 5:41 P.M., with three text message threads having been received, but not marked as unread, beginning at 4:53 P.M., when the vehicle and therefore the phone were in the custody of JPD.[81]  The metadata for a similar photo was 5:36:19.[82]

---

[77] *Id.* at 402:25–403:8.
[78] *Id.* at 403:11–407:16.
[79] *Id.* at 184:11–16.
[80] *Id.* at 235:16–18.
[81] DP17.
[82] DP36B.



83

These threads reflect evidence of drug sales.[84] Det. Lundquist could not testify as to whether anyone else had read the text messages.[85] Branson, who was also present, similarly could not explain why the photo, the metadata, and the Cellebrite report suggested that the text messages had been read at that point.[86]

---

[83] DP17. Partially redacted by the Court.
[84] *See*, DP36E and DP36D.
[85] Tr. at 191:2–16.
[86] *Id.* at 205:11–18; 206:7–19.

Trooper Carson also testified to his involvement in the post-warrant search of the impounded vehicles. He confirmed that Det. Lundquist had taken the photos of the iPhone and that the hand in the photos was likely his own, but he denied having read any of the text messages, though he admitted that the text messages appear to have been read from the photo.[87] He also denied having seen anyone else read the text messages.[88] Trooper Carson was also asked extensively about the process for logging evidence, but he too was unable to explain why the chain of custody report reflected the cellphone being first logged nearly twenty-four hours later other than proffering that it may have just been in a secure area until that time.[89] He was asked further questions about the chain of custody for the cellphone, though he was generally unable to answer directly as to where it was between Det. Wise checking it out on May 8th and it being checked back in on May 13th, and he was also unable to explain why the cellphone's Cellebrite report reflected it being located around midnight on May 12th several miles away from the police station.[90]

**Patrick Taylor**

This Court heard from Patrick Taylor ("Taylor"), a former detective with JPD.[91] In addition to field work, he was also a forensic technician who would create Cellebrite reports, which are downloads of cellphones.[92] After describing his process for making Cellebrite reports and generally explaining to the Court the user interface of the program,

---

[87] *Id.* at 236:6–237:8; 239:5–25.
[88] *Id.* at 240:1–2.
[89] *Id.* at 246:13–248:11.
[90] *Id.* at 250:16–256:24.
[91] *Id.* at 67:1–68:8.
[92] *Id.* at 68:5–8.

he answered questions regarding him extracting Ms. Davis's iPhone.[93]  He explained that with iPhones, he would download the entire phone's contents, but one would then have to tailor the report to the specifics of the search warrant.[94]  He would generally leave this to the investigator.[95]  He separately testified briefly to best practices, opining that it would "depend[ ] on the case" whether it would be advisable to look through the phone as a user would prior to performing the extraction.[96]

### Mark Pfoff

This Court heard from Mr. Mark Pfoff ("Pfoff"), the Defendant's expert witness. After hearing about Mr. Pfoff's extensive law enforcement and technical experience, training, and expertise, this Court qualified him as an expert in digital forensics, cellphone forensics, and Cellebrite extractions.[97]  Mr. Pfoff spoke credibly and with precision as to his methods, his findings, and the limitations to his report.  This Court found his contribution to this matter to have been incredibly helpful, and it has confidence in his representations during the proceedings.  His primary initial opinion, with which this Court agrees, is that Ms. Davis's iPhone had been tampered with and searched prior to the obtaining of the search warrant.[98]

Mr. Pfoff was asked about the troubling timeline that he was able to reconstruct from the extraction and the law enforcement reports.  The first that this Court will address

---

[93] *Id.* at 69:20–87:25.
[94] *Id.* at 72:23–73:1.
[95] *Id.* at 90:19–91:8.
[96] *Id.* at 89:8–18.
[97] *Id.* at 272:4–277:6.
[98] *Id.* at 277:17–25.

is the timeline of the three text message threads being read in the impoundment lot of JPD. From his analysis, Mr. Pfoff testified that these three threads were first opened on May 6, 2020 at 5:40:04–20 P.M.[99]  He further testified that while he can see when a text message is read for the first time, Cellebrite's data does not show if or when a text message was read a subsequent time.[100]

[99] *Id.* at 281:2–21; DP36A (rows 1–6).
[100] Tr. at 283:4–13.

| | | To<br>From<br>+1907 ▮▮▮▮<br>Direction:<br>Incoming | Time<br>5/6/2020<br>5:13:06 PM(UTC-8)<br>Read:<br>5/6/2020<br>5:40:04 PM(UTC-8) | Read |
|---|---|---|---|---|
| 1 | Inbox | To<br>From<br>+1907 ▮▮▮▮<br>Direction:<br>Incoming | Time<br>5/6/2020<br>5:13:06 PM(UTC-8)<br>Read:<br>5/6/2020<br>5:40:04 PM(UTC-8) | Read |
| 2 | Inbox | To<br>From<br>+1907 ▮▮▮▮<br>Direction:<br>Incoming | Time<br>5/5/2020<br>9:52:15 PM(UTC-8)<br>Read:<br>5/6/2020<br>5:40:04 PM(UTC-8) | Read |
| 3 | Inbox | To<br>From<br>+1907 ▮▮▮▮<br>Direction:<br>Incoming | Time<br>5/5/2020<br>9:52:33 PM(UTC-8)<br>Read:<br>5/6/2020<br>5:40:04 PM(UTC-8) | Read |
| 4 | Inbox | To<br>From<br>+1907 ▮▮▮▮<br>Mark*<br>Direction:<br>Incoming | Time<br>5/6/2020<br>4:20:04 PM(UTC-8)<br>Read:<br>5/6/2020<br>5:40:20 PM(UTC-8) | Read |
| 5 | Inbox | To<br>From<br>+1907 ▮▮▮▮<br>Mark*<br>Direction:<br>Incoming | Time<br>5/6/2020<br>4:53:28 PM(UTC-8)<br>Read:<br>5/6/2020<br>5:40:20 PM(UTC-8) | Read |
| 6 | Inbox | To<br>From<br>+1907 ▮▮▮▮<br>Mark*<br>Direction:<br>Incoming | Time<br>5/6/2020<br>4:53:32 PM(UTC-8)<br>Read:<br>5/6/2020<br>5:40:20 PM(UTC-8) | Read |

[101]

Mr. Pfoff then spoke to the photos of the iPhone. First, he noted that the three contacts without the blue dots (which indicates that they have been opened) aligned with the three contacts that his report showed being read at 5:40 P.M.[102] While the timestamp

---

[101] DP36A. The redactions were made by the Court, but the highlighting was in the copy provided.
[102] Tr. at 284:8–286:5; DP36B1–B2.

on the metadata of the photo and the reflected time on the iPhone are a few minutes apart, the pictures of the iPhone reflect the times of 5:40 and 5:41 P.M., respectively.[103]

Mr. Pfoff also spoke to the nature of the search of the vehicles, which is when the iPhone was collected and his concerns about that process. He was puzzled as to why there was not a photo taken of the iPhone where it was discovered in the vehicle and why the first photo reflected it being in an officer's hand.[104] He testified that he would not have performed the vehicle search in that manner during his time conducting such searches as a law enforcement investigator. *Id.*

Mr. Pfoff also spoke to a more ubiquitous category of logs in his report. At times, the iMessage application would authenticate a contact.[105] While Mr. Pfoff cannot be certain as to the exact activity performed, where it appears on his report, it indicates that the cellphone was not in airplane mode and that a user did something in the iMessage application in a contact to make it authenticate the contact. *Id.* This may have occurred for instance, if the individual reading the text message thread accidentally tapped on the keyboard popup and started to type, sending an ellipsis to the contact. An instance of this occurs a second after one of the text messages was read at 5:40:21 P.M.

| 57 | Log Entries | | | | 5/6/2020 5:40:21 PM(UTC-8) | | iMessage: Apple authentication process has been performed for the following apple-ids: +1907███ Source file: Janel's iPhone/mobile/Library/Preferences/com.apple.identityservices.idstatuscache.plist : 0x4ED0 (Size: 55304 bytes) |
[106]

---

[103] DP36B1–B2.
[104] Tr. at 292:13–293:10.
[105] *Id.* at 288:2–290:2.
[106] DP36C at row 57. Partially redacted by the Court.

He also spoke to the chain of custody for the iPhone.  He testified that he found "it very concerning having been an investigator for so long and having seized so much digital evidence" that anyone would have seized the iPhone on May 6th but not have it logged into evidence until May 7th at 4:26 P.M.[107]  He described the "birth to death" approach, where one should note every piece of evidence from the time it comes into law enforcement custody and catalog where it is at all times in every subsequent report.  *Id.*  This did not occur here.

But Mr. Pfoff concerns did not end there.  While the cellphone was logged into evidence at 4:26 P.M. on May 7th, at 4:03 P.M., his report shows two entries for authentications from iMessage.

| 58 | Log Entries | | | 5/7/2020 4:03:09 PM(UTC-8) | | iMessage: Apple authentication process has been performed for the following apple-ids: +1907███ Source file: Janel's iPhone/mobile/Library/Preferences/com.apple. identityservices.idstatuscache.plist : 0x4288 (Size: 55304 bytes) |
| 59 | Log Entries | | | 5/7/2020 4:03:12 PM(UTC-8) | | iMessage: Apple authentication process has been performed for the following apple-ids: +1907███ Source file: Janel's iPhone/mobile/Library/Preferences/com.apple. identityservices.idstatuscache.plist : 0x3FBC (Size: 55304 bytes) |

108

Even more disturbingly, this authentication process took place for two separate contacts for Mr. Powers in Ms. Davis's iPhone.  *Id.*  This means that the iPhone was on, not in airplane mode, and that human intervention related to Ms. Davis's text message threads with Mr. Powers caused this action.  *Id.*

---

[107] Tr. at 294:4–295:11.
[108] *Id.* at 295:13–297:19; DP36C (rows 58–59).  Partially redacted by the Court.

The search warrant was obtained on May 8th at 12:05 P.M.[109]  The iPhone was checked out of evidence at 2:30 P.M. that day by Det. Wise.[110]  However, it was not directly brought to the Cellebrite technician.  Instead, beginning at 3:28 P.M., several text messages were read.[111]  The first message that was read was from Mr. Powers.  *Id.*

| 60 | SMS Messages | Incoming | | | 5/8/2020 3:28:15 PM(UTC-8) [Read] | From: +1907 ████ David P To: |
| --- | --- | --- | --- | --- | --- | --- |

[112]

Mr. Pfoff was concerned about this.  First, a cellphone should only be checked out post-warrant by the Cellebrite technician, kept either in airplane mode or in a Faraday bag, and it should not be looked through as a user would.[113]  Looking at the contents of a phone natively could compromise the integrity of a subsequent Cellebrite extraction.[114]

Mr. Pfoff then spoke to another concerning matter before the Cellebrite report was created.  On May 12th at 12:00:05 A.M., the iPhone recorded a G.P.S. location far away from the Juneau police station in the Lemon Creek neighborhood.[115]

---

[109] DP13.  This Court notes the scrivener's error therein.
[110] Tr. at 298:19–24.
[111] *Id.* 299:4–21; DP36C (rows 60–66).
[112] DP36C at row 60.  Partially redacted by the Court.
[113] Tr. at 300:2–301:15.
[114] *Id.* at 301:16–302:14.
[115] *Id.* at 302:20–303:22; DP36C (row 67).



The Cellebrite extraction occurred in the morning of May 12th.[117]  Mr. Pfoff also spoke to the quality of the report itself.  Mr. Pfoff explained the user interface and what certain values on the summary report mean, though they are largely self-explanatory.[118] Reviewing the summary report from Ms. Davis's cellphone extraction, Mr. Pfoff was able to confirm that the following was collected and in the report: 23,280 log entries, 10,212 SMS messages, 1,773 web history results, 14,272 images, 477 audio files, and 546 videos, among several other categories.[119]  Mr. Pfoff was unable to confirm that an individual running a Cellebrite report would have been able to tailor the categories pulled from a cellphone initially, but he confirmed the importance of tailoring the categories reflected in

---

[116] DP36F.
[117] DP36I.
[118] Tr. at 315:10–319:7.
[119] *Id.* at 320:14–321:17; DP36J.

the report to comply with the scope of a search warrant.[120]  Mr. Pfoff then authenticated various exhibits, such as the web search history discussed *supra* and the contents of the text message threads that were opened.  These text message threads, consistent with Defendant's representations, indicate distribution of drugs.[121]

## III.    DISCUSSION

Mr. Powers has demonstrated that he has standing to challenge the search warrant for Ms. Davis's iPhone, but Mr. Bischoff has not.  As to Mr. Powers, the record makes clear that law enforcement had unlawfully searched Ms. Davis's iPhone and that the government has not rebutted that the decision to seek that search warrant was not influenced by the unlawfully discovered text messages.  Law enforcement's actions throughout this investigation were errant at almost every step, and the only proper remedy is suppression.

### a.    Standing to Challenge the Search of the iPhone.

This Court finds that Mr. Powers has standing to assert a privacy interest in Ms. Davis's iPhone, but Mr. Bischoff does not.  The Fourth Amendment provides that all persons shall be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"[122]  To successfully fall under the protection of the Fourth Amendment, one must establish (1) that he "manifested a subjective expectation of privacy in the object of the challenged search" and (2) that "society [is] willing to recognize that

---

[120] Tr. at 324:6–325:4.
[121] DP36D and DP36E.
[122] U.S. Const. Amend. IV.

expectation as reasonable."[123]  "[A] defendant who lacks an ownership interest may still have standing to challenge a search, upon a showing of 'joint control' or 'common authority' over the property searched."[124]

Mr. Powers argues that two cases are analogous to the present matter: *United States v. Johns*[125] and *United States v. King*.[126]  In *Johns*, the Ninth Circuit found that the defendant had standing to challenge the validity of the search of a storage unit.  It reasoned that because the defendant was a co-owner of the chemicals found within the storage unit and partially paid for the storage unit, and because there was no evidence to rebut his joint control of the unit, that it must find that the defendant had standing.[127]  In *King*, the Northern District of California found that the defendant had standing to challenge the search of a laptop that belonged to a sex worker "[b]ecause the government has not rebutted that King used the computer as if it were his own[.]"[128]

The government argued during closing that the following facts weigh against Mr. Powers's standing argument: (1) that the cellphone was found on Ms. Davis's person, (2) that the vehicle that Ms. Davis was in did not belong to Mr. Powers, (3) that Mr. Powers was not present at the Fred Meyer with Ms. Davis, and (4) that Ms. Davis did not have a passcode on the cellphone.[129]  The government also pointed to the fact that Mr. Powers has

---

[123] *California v. Ciraolo*, 476 U.S. 207, 211 (1986).
[124] *United States v. Thomas*, 447 F.3d 1191, 1198 (9th Cir. 2006).
[125] 851 F.2d 1131 (9th Cir.1988).
[126] 560 F. Supp. 2d 906 (N.D. Cal. 2008).
[127] 851 F.2d at 1136.
[128] 560 F. Supp. 2d at 914.
[129] Tr. at 463:7–464:2.

his own cellphone that had a passcode, that the two were not legally married, and it argued that Mr. Powers's use of the cellphone was "minimal and sporadic."[130]

Bischoff's position was brief. He argued that he did not "dispute that the evidence we heard over the past three days do[es] not establish that [he] had standing regarding Ms. Davis'[s] phone."[131] Instead, his position was that due to "extraordinary circumstances" in this matter, suppression is still appropriate.[132] While this Court agrees that there are extraordinary circumstances here, it has not been given support from the case law to find that Mr. Bischoff can assert this claim.

As to Powers, this Court finds that he has standing. First, while this Court does not find that one generally can assert a privacy interest over a romantic partner's cellphone, the usage of this cellphone was not typical. This Court heard testimony from both Ms. Davis and Mr. Powers that Mr. Powers used the cellphone for his own purposes, such as searching for pornography, online shopping, or looking at vehicle parts for his shop. This is supported by Mr. Pfoff's analysis of the extraction, and this Court has seen dozens of such examples that only included the months of April and May of 2020. Mr. Powers's usage of the phone to search for pornography especially demonstrates that he went beyond treating the cellphone as Ms. Davis's, but he instead treated it as a common item between them. This Court also took evidence as to some of the contents on the phone, such as sexually intimate videos between Mr. Powers and Ms. Davis, and both testified that such materials

---

[130] *Id.* at 465:12–17; 467:12–21; 468:9–14.
[131] *Id.* at 474:2–4.
[132] *Id.* at 474:6–12.

were strictly private. Ms. Davis also explained why she did not have a passcode: to make it easier for Mr. Powers to access it because he had difficulty remembering a passcode.

This Court's analysis is not dependent on the legal nature of the relationship between Powers and Davis. Accordingly, the couple's position on whether they are married is immaterial. It also does not impact this Court's analysis that Ms. Davis had the cellphone with her in a car not owned by Mr. Powers without Mr. Powers present. Mr. Powers's legitimate expectation of privacy is not extinguished when Ms. Davis is not nearby.

This Court is also unpersuaded by the government's argument that the lack of a passcode should impact whether Mr. Powers has an expectation of privacy. First, Ms. Davis gave a credible explanation that supported the theory that Mr. Powers used the cellphone as his own; that she did not have a passcode so that he could more easily use it. Second, accepting the government's argument could jeopardize a broad array of privacy interests due to one not affirmatively protecting themself from intrusion. For instance, finding that Mr. Powers did not have a privacy interest because Davis's cellphone was unprotected might also lead to a finding that Ms. Davis's privacy interest was likewise diminished. The government's argument is clearly untenable when considered in the context of a residence or vehicle. By parity of reasoning, a homeowner's privacy interest in their home would be diminished if the front door were left unlocked. This Court is not persuaded by this line of reasoning.

This Court has reviewed the record and concludes that the government has not rebutted Mr. Powers's heavily supported and well-presented argument that he had joint

control and usage of the cellphone and that he used it as his own.  Accordingly, while *King* is not binding on this Court, it agrees with its analysis regarding standing and believes the relevant facts to that decision are sufficiently analogous here.

### b. Law Enforcement Unlawfully Searched the iPhone Before Obtaining the Search Warrant, and Such Discoveries Influenced the Decision to Apply for the Search Warrant.

Even if evidence is obtained in violation of the Fourth Amendment, exclusion is only appropriate when "the deterrence benefits of suppression [ ] outweigh its heavy costs."[133]  Courts are to exclude evidence to place the government "in the *same* position they would have occupied if no violation occurred, but [not] in a *worse* one."[134]  If law enforcement would have obtained the disputed evidence in any event, excluding the evidence would put it in a worse position than it would have been in absent the illegal search.[135]  To demonstrate the applicability of this exception, the government must establish that the unlawfully obtained evidence and information did not "affect[ ] either [1] the law enforcement officers' decision to seek a warrant or [2] the magistrate's decision to grant it."[136]  The Supreme Court has described the burden on the government as "onerous[,]" as it must show "that *no* information gained from the illegal" search "affected law enforcement officers' decision to seek a warrant[.]"[137]  In effect, the government must prove a negative here, but that is its burden since a constitutional violation has taken place.

---

[133] *Davis v. United States*, 564 U.S. 229, 237 (2011).
[134] *Murray v. United States*, 487 U.S. 533, 541 (1988) (emphasis in original).
[135] *United States v. Saelee*, 51 F.4th 327, 335 (9th Cir. 2022).
[136] *Id.* (citing *Murray*, 487 U.S. at 539–40).
[137] *Murray*, 487 U.S. at 540 (emphasis added).

Here, the record demonstrates that Ms. Davis's iPhone was unlawfully searched prior to Det. Wise obtaining a search warrant. First, from both the pictures taken by law enforcement and Mr. Pfoff's analysis of the Cellebrite report, three text messages were opened around 5:40 P.M. on May 6, 2020. While each officer present denied knowledge of this, and the government has attempted to build a record that perhaps the phone had to be manipulated to put it into airplane mode, this Court is unconvinced. The record establishes that someone deliberately opened these threads during this time, and while this Court may have excused one opened thread as being accidental or just a result of the iPhone opening to that thread during the attempt to put it into airplane mode, there is no reason why it should have happened thrice. The Court also notes that the particular threads that were read, of the many possible threads, appear to be precisely those with evidentiary value. These messages seem to have been selectively targeted by someone who knew what they were searching for, such as the thread with the final message reading "$200[,]" which was visible from the iMessage summary screen. The record confirms that these specifically selected text messages contained communications evidencing the distribution of drugs.

Second, this Court finds Mr. Pfoff's testimony regarding the authentication logs at 4:03 P.M. on May 7th to be both credible and likely. Someone had used the iPhone's iMessage application before checking the phone into evidence. It was not in airplane mode, and the two (and only two) logs related to two separate numbers for Mr. Powers.

Third, the record demonstrates that Det. Wise had suspected Mr. Powers and that Mr. Powers was a target of the intended search warrant. Despite Det. Wise's testimony that he had little prior knowledge of Mr. Power's before the encounter with Ms. Davis on

May 6th, this is rebutted. The logging of activity in iMessage for both of Mr. Powers's contacts on May 7th lends support for the notion that someone in JPD was looking at his text messages with Ms. Davis. Further, it is not lost on this Court that the first thing that Det. Wise looked at post-warrant in the cellphone was a text message from Mr. Powers. In fact, he was so eager to read that message that he compromised the integrity of the Cellebrite extraction by reading it natively on the phone, instead of waiting for the report to be available.

Further, this Court finds that the government has not met its burden to show that Det. Wise would have sought the search warrant absent any information found on the cellphone. First, law enforcement released Ms. Davis in the afternoon on May 6th, indicating that they did not then believe that they had probable cause for drug trafficking. Second, law enforcement only found personal use amounts of controlled substances that day – less than a gram of methamphetamine, less than half a gram of heroin, and below the reporting limit of buprenorphine.[138] Third, there were no other indicia of drug sales, as Ms. Davis had only a reasonable amount of cash on her person. There was no packaging, scales, ledgers, or any indicia of the sale of controlled substances. Taking into account that this Court does not believe that Ms. Lindoff told law enforcement that she was there to purchase drugs from Davis or to find out if she had any for sale, law enforcement would not have probable cause to believe that she was involved in drug sales. Fourth, law enforcement obtained several search warrants that day, but not one for the iPhone. It was

---

[138] DP226.

only after unlawfully searching it that law enforcement decided that it would further its investigation to lawfully do so.

Further, Det. Wise testified as to what qualified to him as the only "distinguishing evidence" that someone was involved in the sale of controlled substances versus simply using them. He testified such evidence would be "[c]ell phone information saying: I have this. They say how much, and they agree to sell. Ledgers on who owes them money. Conversations you had with other people. Surveillance watching them do this."[139] He refused to acknowledge other indicia, such as large amounts of drugs or cash, as being indicative of drug sales.[140] Det. Wise was given several opportunities to answer questions about suspicion of drug sales, and the only factor that mattered for him that is present in the current dispute are text messages indicating distribution. This Court takes him at his word, and it believes that these text messages convinced him to apply for a search warrant to search for evidence of drug sales.

Finally, Det. Wise testified that he had discussed whether to seek a search warrant for the iPhone with other law enforcement officials and that such conversations contributed to his decision. However, he was unable to speak to any of the specifics. Because this Court has found that law enforcement had unlawfully searched the iPhone prior to the obtaining of the search warrant, this Court agrees with the Defendant that it is likely that some of these conversations pertained to the unlawful discoveries on the cellphone.

---

[139] Tr. at 103:11–18.
[140] Id. at 102:19–104:1.

Accordingly, not only has the government failed to meet its "onerous" burden of demonstrating that the unlawful searches did not influence the decision to obtain a search warrant, the Defendant has nearly proven that it is certainly the case that law enforcement's decision to search the cellphone was predicated not only on what it discovered, but out of a desire to obtain information on Mr. Powers specifically.

### c. Law Enforcement Repeatedly and Brazenly Violated the Constitution, Evidencing Bad Faith.

"[W]hen law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system."[141]  When law enforcement has acted in good faith, the deterrent-value of suppression "loses much of its force."[142]  The series of violations indicate that this search was not obtained in good faith and that JPD generally had acted with a reckless disregard (at best) for the subjects' constitutional rights and best practices generally.

The Court finds that law enforcement violated the Constitution in the following ways: (1) Beck violated Ms. Davis's constitutional right against an unreasonable detention by detaining her without reasonable suspicion; (2) the search of Ms. Davis's person clearly violated *Terry*; and (3) the Cellebrite extraction report did not comport to the scope of the search warrant.  It similarly finds that law enforcement separately violated best practices in the following ways: (1) for failure to maintain a chain of custody in a reasonable manner;

---

[141] *United States v. Leon*, 468 U.S. 897, 908 (1984).
[142] *Id.* (internal citation omitted).

and (2) for compromising the integrity of the extracted data by searching the iPhone pre-extraction. This Court also finds the following disturbing: (1) the sworn statements for the various warrants were littered with inaccuracies; (2) Hoffman's reopening of the Chevy door, permitting rain to get inside the vehicle; (3) counsel's representation that JPD had been difficult during the discovery process towards the Defendant. The inaccuracies were as follows: (1) there was no methamphetamine pipe found on Ms. Davis's person; (2) she did not have a large amount of cash on her person; (3) she was not notably anxious, nor was she rapidly smoking her cigarette; (4) the sworn statement did not reference the window of the vehicle being down during the K-9 sniff; and (5) there is no indication from the record that Ms. Lindoff told Det. Wise that she was there to buy drugs from Ms. Davis.

1. Beck Detained Ms. Davis without Reasonable Suspicion.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"[143] "The touchstone of the Fourth Amendment is reasonableness. The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."[144] "Brief, investigatory detentions are proper when the length and scope of the detention are justified by the circumstances giving rise to the detention."[145] For such detentions, law enforcement need only have reasonable suspicion of criminal activity.[146] Reasonable suspicion is more than a mere hunch. Rather, it is an objectively reasonable

---

[143] U.S. Const. Amend. IV.
[144] *Fla. v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted).
[145] *United States v. Sosa-Martinez*, 187 F.3d 650 (9th Cir. 1999).
[146] *Pierce v. Multnomah Cnty.*, Or., 76 F.3d 1032, 1040 (9th Cir. 1996).

belief that criminal activity "may be afoot" "supported by articulable facts[.]" *Id.* This standard is below probable cause and even "is considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.*

Law enforcement may not solely rely on an anonymous tip without some indicia of reliability to establish reasonable suspicion. However, a tip may qualify if it (1) includes a "range of details"; (2) predicts the suspect's future actions rather than simply describing observed facts; and (3) is corroborated.[147] "Predictive information that reveals a detailed knowledge of an individual's intimate affairs is more reliable than predictive information that could be observed by the general public, and such self-verifying detail is considerably more valuable if it relates to suspicious activities than if it relates to innocent activities"[148] A mere accusation of wrongdoing is insufficient.

Here, the tipster was anonymous, did not explain the basis of the knowledge behind the tip, and offered no predictive information.[149] The caller only stated that a "lady was handing bags and it looks sketchy" and that the caller believed that the lady's name was Janel. Beck testified that his only basis for corroborating the tip was seeing the green Ford Ranger and confirming the occupant's identity as Ms. Davis.[150] As such, before parking his patrol vehicle behind Ms. Davis's car, he only knew of the tip and that a green Ford Ranger was in a grocery store parking lot. There is no indication that he waited and observed the vehicle to determine whether any potentially unlawful activity was afoot. He

---

[147] *United States v. Morales*, 252 F.3d 1070, 1075–76 (9th Cir. 2001).
[148] *United States v. Rowland*, 464 F.3d 899, 907–08 (9th Cir. 2006)(citations omitted).
[149] Tr. at 372:6–25.
[150] *Id.* at 374:11–16.

had no basis other than hearing over the radio that possible drug dealing was occurring in the Fred Meyer's parking lot, which itself was based only on the anonymous tip. With the paltry details provided, no substantive corroboration, and no indication of the suspect's future movements, this Court finds that there was no reasonable suspicion prior to parking his vehicle behind Ms. Davis's.

This Court also finds that by doing so, he detained Ms. Davis. The body camera footage reflects that Ms. Davis was nearly surrounded by parked vehicles. The Chevy was in the parking spot to her right, a second car (possibly in disrepair) was in front of her, and the patrol vehicle was maybe a vehicle's length distance behind her.[151] While there was some discussion by the government that Ms. Davis was free to execute a sharp turn and drive away, this Court does not find this credible. Any reasonable person would know that they were not free to leave when a police vehicle parks directly behind them, even if they could possibly (and perhaps dangerously) maneuver their vehicle out of a tight squeeze. As such, this Court finds that Ms. Davis was initially detained without reasonable suspicion.

2. The Search of Ms. Davis's Person Exceeded the Bounds of *Terry*.

Under *Terry*, a law enforcement officer may conduct a brief investigatory stop upon a reasonable, articulable suspicion that criminal activity is occurring.[152] An officer may pat down a suspect's outer clothing.[153] As an analog to the plain view doctrine, "plain

---

[151] *See*, DP1 at 0:00:01–1:15 for a brief view.
[152] *Terry v. Ohio*, 392 U.S. 1, 19 & 27 (1968).
[153] *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

feel," or what is "immediately apparent" upon the pat down, is within the same scope of privacy that was authorized to be intruded upon by the underlying reasonable suspicion.[154] *Terry* confines law enforcement to make limited searches "reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."[155] This test is objective: "whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger."[156] As such, if the officer could feel that an item was a weapon or contraband upon the pat down of the outer layer of clothing, its discovery was not in violation of the Fourth Amendment.

Here, the record demonstrates that Beck and Hoffman performed defective *Terry* searches on Ms. Davis and Mr. Jerue. This Court will assume that there was reasonable suspicion at this time, though it does not make such a finding. The body camera footage shows both Beck and Hoffman immediately checking inside Ms. Davis's pockets with a flashlight and searching within.[157] There was no pat-down, so there was no plain feeling of anything, let alone contraband or an item that might threaten an officer's safety. When asked about this, Beck conceded that this was "probably not" a pat-down.[158] However, he went on to rebut counsel for the Defendant, admonishing the attorney for "getting really technical[,]" explaining that with "those big poofy jackets, they have really deep pockets, and so it's hard to ascertain if there's a weapon inside of those really deep pockets."[159] He

---

[154] *Id.* at 375–76.
[155] *Terry*, 392 U.S. at 29.
[156] *United States v. Brown*, 996 F.3d 998, 1007 (9th Cir. 2021).
[157] DP1 at 10:29–11:00; DP3 at 4:29–5:00.
[158] Tr. at 377:17–20.
[159] *Id.* at 378:7–12.

went on to explain that "grabb[ing] the outside of her [ ] pockets [. . .] is more typically thought of as a pat-down search."[160] He preferred this approach because it was "much easier to feel and to see if it's empty" by simply looking inside the pocket as he had.[161] Putting aside that the exhibit reflects Mr. Jerue not wearing a jacket and Officer Hoffman reaching inside of the pockets on his pants in the first instance, such manipulation takes these searches outside of the plain feel exception in *Terry*.

This lone instance is disturbing enough. However, this Court draws two inferences from Beck's testimony and his demeanor during the hearing. First, that he continues to find this action to be appropriate *Terry* pat-down. Second, and more disturbingly, that he and JPD might regularly behave in this manner.

   3.     The Cellebrite Extraction Was Not Tailored to the Search Warrant.

The Cellebrite extraction exceeded the scope of the search warrant signed by Judge Swanson. The search warrant authorized the following: "Calendar; Call Log; Contacts; Installed Applications; Location history; MMS / SMS Messaging; Notes; Timeline; Web Bookmarks; Web History; User Accounts; Searched Items; Cookies; Device information[.]"[162] This Court will accept Det. Taylor's representation that he had to download the entirety of the iPhone for the extraction given technical limitations for the type of device. However, the record reflects categories of materials not within the search warrant being in the final report. The Cellebrite report contains thousands of individual

---

[160] *Id.* at 378:17–19.
[161] *Id.* at 378:19–20.
[162] DP13.

entries outside the scope of this warrant. For instance, over fourteen-thousand images, hundreds of videos, hundreds of audio files, and several other matters such as emails, saved passwords, voicemails, and "Log Entries[,]" which itself was over twenty-three thousand data files.[163] Mr. Pfoff was unable to answer affirmatively whether any tailoring was performed before the final Cellebrite report was made available to Det. Wise, but it appears from the record that this step was omitted.

This Court also notes Mr. Powers's argument that the warrant was overbroad as obtained. This Court does not make a recommendation on that matter, however, because non-compliance with the underlying warrant overshadows any issues as to overbreadth.

4.    The Chain of Custody of the Cellphone and the Unlawful Pre-Warrant Searches Compromised the Integrity of the Extraction.

Law enforcement consistently mishandled the evidence. This Court finds credible the testimony from Mr. Pfoff on the proper protocol for handling the matter. First, the first picture of the cellphone should have been its position where it was first seen in the vehicle, not in an officer's hand. Second, it should have been promptly logged into evidence. Waiting nearly twenty-four hours to document the location of key seized evidence was unprofessional, as it breaks the chain-of-custody. Third, Det. Wise should not have taken the cellphone out of evidence to look through it natively. He checked it out of evidence on May 8th, but the Cellebrite extraction did not take place until May 12th. This gap and native use compromised the integrity of the extraction. This Court is also left concerned and baffled about why the cellphone's location would have pinged several miles away from

_____

[163] DP36J.

the JPD station at a location adjacent to a co-defendant's family member's residence. While this Court is reluctant to infer the worst here, no inference should ever have to be made here. Even avoiding drawing an adverse inference, it should not be necessary to state: the cellphone's location should have been properly accounted for at all times. It was not.

5.      The Inaccuracies in the Sworn Statements and <em>Franks</em>.

It is clear from the record that certain inaccuracies were present across several of the search warrants in this case. While the present matter involves the search warrant for the iPhone, Judge Swanson informed Det. Wise that she was incorporating Sergeant Beck's statements pertaining to the May 6th search warrants.[164] Accordingly, this Court will consider the statements made by both individuals.

Even if there is a search warrant, the search or seizure may be unreasonable, nonetheless. For instance, if an affiant is permitted to mislead a magistrate judge, that could "denude the probable-cause requirement of all real meaning."[165] If a court, after holding an evidentiary hearing, determines that an:

> allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.[166]

---

[164] DP12 at 2:30–3:15.

[165] *Franks v. Delaware*, 438 U.S. 154, 168 (1978).

[166] *Id.* at 156.

The Ninth Circuit has summarized *Franks* with a two-step analysis: "a defendant must show [by a preponderance of the evidence] (1) the affidavit contains intentionally or recklessly false statements [or omissions], and (2) the affidavit purged of its falsities would not be sufficient to support a finding of probable cause."[167] As such, once a court has determined that the affiant made a misrepresentation of an omission, it must find materiality. A representation or omission is material if it is "necessary to the finding of probable cause."[168] Courts look to "whether probable cause remains once the evidence presented to the magistrate judge is supplemented with the challenged omissions."[169]

First, a methamphetamine pipe was not found on Ms. Davis's person.[170] Second, there was not a large amount of cash found on Ms. Davis's person as it was only around $162, which this Court finds to be reasonable in the context of being in front of a grocery store in Juneau.[171] Third, a review of the body camera footage does not reflect that Ms. Davis was visibly shaking, smoking a cigarette rapidly, or that she was unreasonably anxious.[172] Fourth, the window of the driver's side door of the Ford Ranger was down, but that was not mentioned when explaining that the K-9 sniff could have been a false negative. Finally, this Court is not convinced that Ms. Lindoff told Det. Wise that she knew that Ms. Davis sold drugs or that she was there to see if Ms. Davis had drugs to sell. The body

---

[167] *United States v. Lefkowitz*, 618 F.2d 1313, 1317 (9th Cir. 1980).
[168] *United States v. Martinez-Garcia*, 397 F.3d 1205, 1214 (9th Cir. 2005) (citing *Franks*, 438 at 155–56.).
[169] *United States v. Ruiz*, 758 F.3d 1144, 1149 (9th Cir. 2014) (internal citation omitted).
[170] Tr. at 383:13–384:14; DP15.
[171] Tr. at 385:14–386:8; *see also*, DP20 at 31 (*see supra* at n.48); DP10 at 16:30–17:05.
[172] Tr. at 380:21–382:4; DP2 at 0:00–1:45.

camera footage does not reflect such an admission. In fact, it reflects Ms. Lindoff maintaining her innocent position that she was there to talk to Ms. Davis about her child spending time with her grandchild. This Court does not find that Det. Wise was intentionally dishonest. Instead, it will construe this as a misunderstanding or a failure of memory.

The Lindoff statement was the primary factual averment that would support reasonable suspicion of drug distribution. While law enforcement was able to establish that they found a small amount of drugs, the amounts that they found only supported possession of controlled substances in personal use quantities, rather than distribution. Accordingly, excising this representation may remove probable cause from the cell phone warrant. However, because this Court has not made a finding that Det. Wise was recklessly or intentionally misleading, *Franks* is not applicable.

## IV. SCOPE OF THE SUPPRESSION

On April 7, 2025, this Court issued its Final Report and Recommendation.[173] On April 29, Judge Burgess recommitted this matter to the undersigned "for modification and such further proceedings as required to define the specific scope of the evidence sought to be suppressed."[174] This Court subsequently ordered the parties to meet and confer and to file status reports on their position on the scope of the evidence to be suppressed.[175]

---

[173] Dkt. 719.
[174] Dkt. 730.
[175] Dkt. 732.

The government noticed this Court that it believes that should the motion be granted, only the contents of Ms. Davis's cellphone should be suppressed.[176] It argues that subsequently obtained evidence, referencing the wiretap investigation specifically, is shielded from suppression by the attenuation exception due to the discovery of "additional criminal activity well after the May 6, 2020, parking lot interdiction."[177]

Powers separately noticed this Court, arguing that much, if not all, of the subsequent investigation must also be suppressed, writing that documents such as the Request to Open Investigation ("ROI") and the Title III warrant were predicated on the discoveries made from the cellphone.[178] Powers also argued that the burden to justify the inclusion of evidence would be on the government, and that the attenuation doctrine is inapplicable both factually and for the flagrancy of the violations.[179] Mr. Bischoff noticed this Court that his position was that the cellphone's contents and unspecified fruits of the poisonous tree should be suppressed.[180] This Court will construe his position as aligning with Mr. Powers's.

Upon due consideration, this Court agrees with Mr. Powers's position and hereby modifies its recommendation to clarify that the entire subsequent investigation into Mr. Powers is presumptively subject to suppression. It agrees with Mr. Powers that the record reflects that the encounter in the grocery store parking lot was the beginning of the

---

[176] *See generally*, Dkt. 735.
[177] *Id.* at 2.
[178] *See generally*, Dkt. 736.
[179] *Id.*
[180] Dkt. 742.

investigation and that all subsequent actions stemmed from, and were consequences of, the discoveries made in May of 2020. It also agrees that the brazen and flagrant constitutional violations warrant a more exacting burden on the government to show attenuation. A burden it has not met.

This Court has reviewed the ROI on David Powers, which is dated June 3, 2020.[181] While this document has been filed under seal, this Court finds that a brief public summary is warranted. The ROI briefly discussed drug trafficking in Southeast Alaska and the 1996 investigation that led to Mr. Powers's prior charges.[182] It then described three additional investigations that the FBI believed implicated Mr. Powers ranging from 1999 to 2011.[183] The ROI was silent from 2011 until May of 2020, when it described the interaction in the grocery store parking lot and detailed the contents of Ms. Davis's cellphone that reflected Mr. Powers's suspected criminal behavior.[184] The ROI did not reference other sources of information in the "Current Information" section other than an undated Suspicious Activity Report triggered by suspicious money movements.[185]

This Court has also briefly reviewed the Title III affidavit.[186] This document was also filed under seal, but this Court will summarize at a high level. The affidavit similarly described drug trafficking in Southeast Alaska and prior investigations ending several years

---

[181] Dkt. 544-2 (sealed)
[182] *Id.* at 1–3.
[183] *Id.* at 3–6.
[184] *Id.* at 7–9.
[185] *Id.* at 7.
[186] 1:21-mj-00013, Dkt. 1 (sealed).

prior.[187]  The probable cause section began with a summary of the events on May 6, 2020,

and immediately transitioned into a six-page presentation of exemplar text messages from

Ms. Davis's cellphone.[188]   It also included information pertaining to pole cameras,

beginning in late May and early June of 2020.[189]  While information detailed in the affidavit

included an extensive investigation, it appears to stem directly and solely from the May 6,

2020 interactions in the parking lot and the search of Ms. Davis's cellphone, which

provided the backbone of law enforcement's probable cause to begin investigating Mr.

Powers.  Considering these documents, this Court believes while Mr. Powers may have

periodically been a person of interest, the search of Ms. Davis's cellphone was the sole tree

from which evidentiary fruit was derived.

     This Court disagrees with the government's position on the attenuation doctrine.

The attenuation doctrine holds that "[e]vidence is admissible when the connection between

unconstitutional police conduct and the evidence is remote or has been interrupted by some

intervening circumstance, so that 'the interest protected by the constitutional guarantee that

has been violated would not be served by suppression of the evidence obtained.'"[190]  The

Supreme Court has directed courts to consider three factors.  First, one must determine the

temporal proximity between the unconstitutional conduct and the challenged evidence.[191]

Stated plainly, the longer the time between the violation and the discovery of the evidence,

---

[187] *Id.* at 1–8.
[188] *Id.* at 15–21.
[189] *Id.* at 21–22.
[190] *Utah v. Strieff*, 579 U.S. 232, 238 (2016) (citing *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)).
[191] *Id.* at 239.

the more likely that suppression would not be appropriate.[192]  Second, courts are to consider

intervening circumstances.[193]  Third, and especially pertinent, "the purpose and flagrancy

of the official misconduct."[194]  This final factor addresses the heart of the analysis.  After

all, the purpose of suppression is not to exonerate a defendant.  Instead, it is to deter law

enforcement's misconduct.[195]  As such, the nature of the misconduct affects whether it is

appropriate to punish it.

The government points to the federal wiretap investigation occurring months after

the initial contact with Ms. Davis and refers to unspecified later discoveries of criminal

activity.[196]  This Court agrees with the Defendant that there was a causal link from the May

6, 2020 interaction and subsequent search of Ms. Davis's iPhone to the rest of the

investigation at least up until the February 2021 Title III warrant for the reasons stated

above.  The chain of events began from, and were predicated on, the discoveries made from

the search of Ms. Davis's cellphone, and the near continuous investigation appears to have

been motivated to further substantiate the suspected drug trafficking activity purportedly

reflected in those text messages.  The government has not pointed this Court to any

intervening circumstances, such as a separate source of information not initially stemming

from the May 6, 2020 encounter, or something such as a different law violation of Mr.

Powers that motivated the investigation.  Accordingly, while this Court recognizes that

---

[192] *Id.*
[193] *Id.*
[194] *Id.*
[195] *Id.* at 241.
[196] Dkt. 735 at 2.

some time had passed over the course of the investigation, it finds that this should hold little weight given the causal chain of events. As such, while factor one weighs in favor of the government, it only does so slightly, and factor two weighs in favor of the Defendant.

The third and most important factor, the flagrancy of the constitutional violations, weighs heavily in favor of Mr. Powers's position. For the reasons detailed at length *supra*, which were not objected to by the government, law enforcement plainly violated the rights of Ms. Davis and Mr. Powers numerous times and without any self-reproach, or even apparent recognition of the violations. Such flagrancy must be held against the government as to the extent of the necessary suppression.

Should this report and recommendation be adopted, the government should be required to notice Mr. Powers of any evidence that it believes survives such suppression order, understanding that the entire subsequent investigation would be treated as presumptively suppressed.

## V. OBJECTIONS

While Judge Burgess did not expressly recommit this matter for revisions pertaining to the submitted objections, because this Court was tasked with modifying its recommendations, it will do so with the benefit of the parties' subsequent filings. Mr. Powers objected to certain clerical errors, and neither Bischoff nor the government replied.[197] This Court has reviewed Mr. Powers's unobjected to filing and it agrees with its analysis. The above report is modified accordingly.

---

[197] Dkt. 723.

Mr. Bishoff objected to this Court's recommendation on standing, arguing that while he "does not dispute that he lacked standing to challenge the search of Ms. Janel Davis's cell phone[,]" the unique circumstances of this case warrant any suppression to be applicable to him.[198] While the government did not reply to Mr. Bischoff's objection, this Court has reviewed it and declines to modify its recommendation that Mr. Bischoff should not have evidence suppressed as to him. As before, this Court is not aware of any authority that the Court possesses to afford him the requested relief absent a showing of standing.

The government objected to this Court's finding that Mr. Powers has standing, but it did not object to any of the other findings.[199] It supports its objection with three arguments: (1) that this Court failed to consider *United States v. Beaudion*;[200] (2) that this Court gave undue weight to Mr. Powers's use of the cellphone; and (3) that this Court's reliance on *United States v. King*[201] was in error.[202] Mr. Powers replied (1) that *Beaudion* is both nonbinding and inapposite; (2) that Mr. Powers had the right to exclude others from the cellphone; and (3) that the government's understanding of *King* is incorrect.[203] Upon review of these filings, this Court declines to modify its recommendation as to Mr. Powers's standing to assert this claim.

This Court agrees with Mr. Powers on *Beaudion*. Accepting that holding would not lead to a different outcome. *Beaudion* involved law enforcement obtaining G.P.S.

---

[198] *See generally*, Dkt. 724.
[199] *See generally*, Dkt. 722.
[200] 979 F.3d 1092 (5th Cir. 2020).
[201] 560 F. Supp. 2d 906 (N.D. Cal. 2008).
[202] Dkt. 722 at 2–5.
[203] *See generally*, Dkt. 729.

coordinates from Verizon to locate a cellphone, but it did not involve a search of a cellphone itself.[204]  For this reason, the Fifth Circuit held that the "place searched" was the location of the cellphone's owner, but not the actual cellphone.[205]

In the context of the place searched being "limited to location information about" the owner, the Fifth Circuit considered whether Beaudion had an "interest in *that* information."[206]  The court had the followed facts before it: "(1) [Beaudion] purchased the physical phone and gave it to [the owner]; (2) he had permission to use the phone; (3) he had password access to the phone; (4) he accessed his Facebook account from the phone; and (5) he used the phone to capture intimate videos of him and [her]."[207]  The Fifth Circuit found that fact (1) was irrelevant and that (3) was factually incorrect.[208]  It considered the remaining three to conclude that "Beaudion sometimes used [her] phone for personal activities [but t]here is no indication that Beaudion ever used or possessed the phone outside of [her] presence[, a]nd the record doesn't tell us how often he accessed Facebook or captured intimate videos."[209]

Here, Mr. Powers had more than mere permission to use the cellphone in Ms. Davis's presence.  Instead, their respective right to possess the phone appears to approximate a joint tenancy, with each having an unfettered and unencumbered right to use and possess the phone.  This Court reviewed forty-nine entries reflecting Mr. Powers using

---

[204] *Beaudion*, 979 F.3d at 1097–98.
[205] *Id.* at 1098–99.
[206] *Id.* at 1099 (emphasis added).
[207] *Id.*
[208] *Id.*
[209] *Id.*

the cellphone in the period of a month. These searches included private matters that reflect that he also used the cellphone outside of the presence of Ms. Davis. As this Court previously found, this was not just a romantic couple being comfortable with each other briefly using the other's cellphone. Instead, this is more akin to a shared household landline. Further, the information sought here was far more extensive than just Ms. Davis's location. It reached a huge breadth of the contents of her phone, and law enforcement exceeded their broad request, nonetheless.

This Court is also unconvinced by the government's argument that because Ms. Davis used the cellphone more than Mr. Powers did, only she has standing. The core of the analysis is whether Mr. Powers had a reasonable expectation of privacy in the cellphone, and his use of the cellphone, while less than Ms. Davis's, demonstrates that he did.

This Court also disagrees with the government's objection to this Court's reliance on *King*. The government distinguishes this case on three bases:

> First, unlike in *King*, police seized Davis's cell phone from her husband's truck, rather than a hotel room that Powers had rented where he could exclude others. Second, Davis considered the phone hers and was the only registered subscriber to the wireless account. [. . .] Finally, any subjective expectation of privacy Powers may have had regarding Davis's cell phone depended on assurances by Davis.[210]

This Court agrees with Mr. Powers's analysis in his reply. First, the location of the device was not pertinent to the court's analysis, but rather, that King "shared the computer with Doe, had her permission to use it, used it when he wanted to, and considered the computer

---

[210] Dkt. 722 at 5.

as belonging to both he and Doe[.]"[211]  Second, given Mr. Powers's use of the cellphone, the cellphone number and the Apple ID being registered in Ms. Davis's name is of little import.

Third, the fact that Ms. Davis *could* have violated Mr. Powers's privacy interest does not lead to the conclusion that Mr. Powers did not have such a privacy interest.  To analogize, joint occupants of a residence each have a privacy interest in the dwelling.  If one occupant consents to law enforcement entering and searching without a warrant while the other is absent, the other occupant would not be able to object to the discoveries made in shared areas of the residence pursuant to the warrantless entry and search.[212]  In that situation, each occupants' privacy could be breached by the other, but that does not negate the fact that each had standing initially.

## VI.    FURTHER EVIDENTIARY PROCEEDING

On May 6, 2025, this Court issued its Revised Report and Recommendation.[213]  This filing is reproduced above.  On May 15, 2025, Senior District Judge Burgess recommitted the matter for further fact finding on the appropriate scope of suppression, referencing new issues raised in the government's objections.[214]  This Court ordered briefing and scheduled an evidentiary hearing.[215]  Because this Court recommends denying the motion as to Mr.

---

[211] *United States v. King*, 560 F. Supp. 2d 906, 914 (N.D. Cal. 2008).
[212] *See*, *Fernandez v. California*, 571 U.S. 292 (2014).
[213] Dkt. 749.
[214] Dkt. 759.
[215] Dkts. 769 & 794.

Bischoff, it did not include him in these proceedings, though he was present for the evidentiary hearing.

### a. Party Filings.

The government argued that the Title III warrant at 1:21-mj-00013 ("Title III") need not be suppressed because the government had an independent source and an attenuated basis.[216] The government did not argue that the inevitable discovery rule was applicable. As to the first exception, the government argued that CS1 and the resulting controlled buys constituted an independent source. Relying on *United States v. Smith*,[217] the government argued that Ms. Davis's cellphone merely gave law enforcement a lead, implicating the attenuation exception separately.[218] The government also furnished a prospective trial evidence list along with an explanatory table for the sources of the evidence.[219] Despite this, the government's argument pertained only to the Title III.

Defendant Powers responded in opposition.[220] The Defendant explained the chronology of the investigation, discussing the installation of the pole cameras, the three pen register/trap and trace warrants, and the identification of CS1.[221] The Defendant argued that the government had not established that CS1 was an independent source because they were identified as a result of the discoveries made from the cellphone and the

---

[216] Dkt. 775-1.
[217] 155 F.3d 1051 (9th Cir. 1998).
[218] Dkt. 775-1.
[219] Dkts. 775-2 & 775-3.
[220] Dkt. 791-1.
[221] *Id.*

subsequent surveillance.[222]  The Defendant further argued that the attenuation doctrine was inapplicable, referring to the chronology of the investigation and the severity of law enforcement's violations.[223]  Nevertheless, the Defendant argued that the Title III lacked probable cause when excising the improperly obtained information.[224]  Accordingly, the Defendant requested suppression of the fruits of the Title III and those of all subsequent warrants, arguing that the government had not met its burden.[225]

### b.      August 5, 2025 Evidentiary Hearing.

On August 5, 2025, this Court took evidence from the parties.[226]  The government, despite having the burden of persuasion, produced only one witness, FBI Special Agent Matthew Judy ("SA Judy").  After brief questions regarding SA Judy's background, he testified to the process of obtaining a Title III warrant, explaining that although there was no "typical time frame, [. . .] it could be months to even a year" from start to finish.[227]  Part of the reason for this length of time are the levels of approval that he had to obtain before submitting an application.[228]  The diligence required prior to submission includes constructing probable cause theories specific to the types of communications being intercepted, which requires toll analyses to confirm that the cellphone has in fact been recently used to communicate with other criminal  actors, instead of merely belonging to

---

[222] *Id.* at 12–26.
[223] *Id.* at 26–30.
[224] *Id.* at 30–33.
[225] *Id.* at 33–36.
[226] Dkt. 799.
[227] Dkt. 803 at 6:14–25.
[228] *Id.* at 7:3–10.

someone suspected of criminal activity.[229]  He also testified that he must also justify the necessity of a Title III warrant, explaining what other investigative techniques have been used and why they have not been successful.[230]

Turning to the Title III at issue here, SA Judy answered that he first began participating in the investigation "shortly after" May 6, 2020.[231]  He testified that Janel Davis's cellphone "initiated the FBI investigation[,]" leading to him requesting administrative subpoenas and pole cameras, neither of which required judicial authorization.[232]  Law enforcement also decided to seek and ultimately obtain a pen register/trap and trace warrant for a cellphone used by David Powers, which SA Judy answered was discovered from Janel Davis's cellphone contents, despite the prosecutor attempting to ask him if Mr. Powers's cellphone was identified by the results of an administrative subpoena.[233]

Law enforcement monitored the use of that cellphone, obtaining multiple extensions, and once usage of the cellphone ceased, SA Judy obtained an administrative subpoena for a "high frequency contact[,]" which lead to him identifying another number registered to David Powers, resulting in another administrative subpoena.[234]  SA Judy further explained that around the time when the cellphone's use was diminishing, which

---

[229] *Id.* at 7:11–9:5.
[230] *Id.* at 9:6–24.
[231] *Id.* at 10:13–22.
[232] *Id.* at 11:5–21.
[233] *Id.* at 12:10–23.
[234] *Id.* at 13:9–14:4.

was around late July or early August, it was law enforcement's "hope to be able to obtain a Title III wiretap[.]"[235]

In early October of 2020, law enforcement decided "to conduct a concentrated surveillance operation" because they "needed to identify somebody that could provide information from the inside."[236] Through this surveillance and additional pole camera footage, law enforcement identified CS1 through contact with Janel Davis in early October, though they had previously accessed text messages between the two.[237] On November 7, 2020, SA Judy received a tip from Sergeant Branson, who accompanied him, Det. Wise, and a DEA agent to interdict the individual at the Juneau airport.[238] Law enforcement made contact with CS1, CS1 admitted to carrying small quantities of controlled substances, and CS1 went to the JPD station with the officers.[239] The government then admitted G-2 and G-2.1, audio recordings of the airport interdiction and the subsequent law enforcement interview.[240] Law enforcement interviewed CS1, were given CS1's cellphone, and interviewed CS1 a second time, who then identified Janel Davis.[241] However, CS1 did not volunteer Ms. Davis's name. After CS1 had listed several names, SA Judy went through the contacts in CS1's cellphone, and asked them about each one, including Janel Davis.[242]

---

[235] *Id.* at 13:9–10; 14:8–9.
[236] *Id.* at 15:6–9.
[237] *Id.* at 15:11–24; 18:4–25; *see also* DP240.
[238] Dkt. 803 at 19:14–20:17.
[239] *Id.* at 21:2–15.
[240] *Id.* at 21:16–22:20.
[241] *Id.* at 22:24–26:1.
[242] *Id.* at 23:5–14.

SA Judy was then asked about an email from Stacy Eldemar, an analyst for JPD, which was separately admitted as DP240. On November 7, 2020, the day of the airport interdiction, he received an email that he "would have read[,]" but did not direct his investigation that day.[243] This email identified CS1 as a contact in Ms. Davis's cellphone and quoted text messages between the two evidencing drug sales.[244] Sergeant Branson was also included on this email, and it was received shortly before the group interdicted CS1 at the airport. CS1 then cooperated with law enforcement to conduct several controlled buys from Janel Davis.[245]

SA Judy discussed some of the portions of the Title III affidavit. For instance, he discussed paragraphs 9–11, which suggested that Mr. Powers was associated with an investigation into a restaurant in Juneau suspected of money laundering and drug trafficking between 2007 and 2012.[246] On cross-examination, SA Judy admitted that he could not imagine that Mr. Powers would have been involved in any of this suspected criminal activity during his time of incarceration, which was from 1996 to October of 2011, and that he believed that Mr. Powers only began his employment at that restaurant, to the best of his memory, in 2013 or 2014.[247] He also averred that Mr. Powers was convicted of a firearms offense in paragraph 9, though that was inaccurate.[248]

---

[243] *Id.* at 26:18–27:7.
[244] DP240.
[245] Dkt. 803 at 28:12–29:6.
[246] *Id.* at 32:3–11; *see* Title III at 7.
[247] Dkt. 803 at 32:20–23; 53:12–54:7.
[248] *Id.* at 33:15–24.

After several more questions about the contents of the Title III affidavit, which included information from the toll analyses, controlled buys, and Ms. Davis's cellphone, he was cross-examined by defense counsel. On cross-examination, SA Judy confirmed that prior to May 6, there were no active investigations into Mr. Powers, that the contents of Ms. Davis's cellphone "definitely what initiated the case[,]" including the installation of pole cameras in front of Mr. Powers's shop and residence, and that the cellphone was the motivation for the continued surveillance.[249] SA Judy also confirmed, referring to DP236 (affidavit for the pen register/trap and trace warrant), that the entire basis for the probable cause statement was the events of May 6 and the contents of Ms. Davis's cellphone.[250] Referring to DP237 (affidavit for an extension), SA Judy confirmed that he repeated this probable cause statement, but included information about potential contacts, which he also based off of text messages from the cellphone, adding an observation of a short-term interaction.[251] In the second extension, DP238, he repeated this probable cause statement, adding another a short-term interaction.[252]

On July 10, SA Judy issued a request for Green Tiger workstations "to support an upcoming Title III criminal intercept."[253] In this request, he listed multiple contacts, almost entirely from Det. Wise's report from the search of Ms. Davis's cellphone.[254] In a toll analysis, DP232, SA Judy also confirmed that multiple listed contacts were from Det.

---

[249] *Id.* at 43:18–44:15.
[250] *Id.* at 47:12–48:13.
[251] *Id.* at 48:14–50:15.
[252] *Id.* at 51:2–15.
[253] DP235; Dkt. 803 at 51:16–52:17.
[254] DP235; Dkt. 803 at 54:25–56:24.

Wise's report.[255]  He further confirmed this repeated list of names from Det. Wise's report

on Janel Davis's cellphone in the "TARGET SUBJECTS/TARGET INTERCEPTEES"

section of his Title III application.[256]

SA Judy then answered questions about a suspicious activity report, DP232, that

this Court does not find necessary to summarize at this time.[257]  SA Judy then testified that

it was "correct" to say that he "had approached [CS1] in the hopes that [they] would

cooperate against Janel Davis or David Powers[,]" and that it was his "motivation in

contacting [CS1] and [his] investigation into them was initiated by the contents of the

iPhone."[258]  SA Judy further confirmed that he told CS1 that CS1 would be facing a

mandatory minimum of ten years to life, that CS1 had not approached law enforcement,

that CS1 did not volunteer any information, and that CS1 had not mentioned Janel Davis

until after law enforcement asked about her, despite CS1 mentioning other individuals.[259]

After a brief re-direct, re-cross, and a further examination, SA Judy was excused,

and this Court heard closing arguments.

### c.    Discussion.

This Court recommends the suppression of the entire investigation following and

including Janel Davis's May 6, 2020 encounter with law enforcement.  Upon review of the

record  and  witness  testimony,  neither  the  subsequent  investigatory  steps  nor  the

---

[255] Dkt. 803 at 57:11–59:20.

[256] *Id.* at 60:2–62:23; *see also* Title III at 8–12.

[257] Dkt. 803 at 62:25–65:10.

[258] *Id.* at 67:3–11.

[259] *Id.* at 70:12–71:20.

cooperation with CS1 shields the wiretap warrant from suppression. CS1 was not an independent source, and the Title III warrant is insufficiently attenuated to be permissible for the government to use at trial. The government has not made any substantive argument nor built any record as to evidentiary materials that it intends to introduce at trial other than the direct fruits of the Title III warrant. Because it is the government's burden to defend its evidence, this Court preliminarily recommends suppression of the entire investigation. While it may modify this scope in response to any objections, the government has not developed a record or even theory of the law that would permit a more tailored recommendation at this time.

### 1. CS1 was not an Independent Source.

"[T]he independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source."[260] The purpose behind this exception follows the justification for the high societal cost of suppression: to put law enforcement in the *same* position that it would have been in absent the unlawfully discovered information, but not a *worse* one.[261] To fall under this exception, the government has the burden to show that the challenged evidence was later obtained "independently from activities untainted by the initial illegality."[262]

Here, this Court remains unpersuaded that CS1 is an independent source. CS1 was identified because they were a contact in Ms. Davis's cellphone, the pole camera footage,

---

[260] *Utah v. Strieff*, 579 U.S. 232, 238 (2016).
[261] *Murray v. United States*, 487 U.S. 533, 537 (1988).
[262] *United States v. Saelee*, 51 F.4th 327, 335 (9th Cir. 2022) (internal citation omitted).

and the monitoring of Ms. Davis and Mr. Powers. The pole camera and the surveillance were conducted exclusively due to the discoveries stemming from May 6, 2020. The "concentrated surveillance operation" that followed was "to identify somebody that could provide information from the inside."[263] While CS1 was involved in suspected drug trafficking to Haines, Alaska, SA Judy had just received a tip on CS1 that identified them that included excerpts of text messages with Janel Davis. SA Judy testified that interdicting CS1 at the airport was motivated by his goal to further investigate the contents of the iPhone via CS1's cooperation against Ms. Davis and Mr. Powers.[264]

CS1 was approached by law enforcement who had knowledge of their wrongdoing and was specifically asked about Ms. Davis. While law enforcement may have simply been reading through the contacts in CS1's cellphone, this Court does not find that CS1 volunteered information so as to make them an independent source of information. Had CS1 approached law enforcement with the intent to participate in a situation outside of the investigation, this analysis would be different. Further, law enforcement's decision to work with CS1 at all, even though simply prosecuting them could have led to a mandatory minimum of ten years, was necessarily motivated by the knowledge that there were bigger fish to fry. This knowledge solely stemmed from the unlawful discoveries on Janel Davis's cellphone.

As this Court has found previously, there is but one evidentiary tree from which the fruit was produced — Ms. Davis's cellphone. CS1 did not come from a different

---

[263] Dkt. 803 at 15:6–9.
[264] *Id.* at 67:3–11.

evidentiary source. Accordingly, this Court disagrees with the government's independent source argument. The Court explicitly does not make an adverse credibility finding against SA Judy.

2. The Title III Warrant is not Attenuated from the Unlawful Search.

As the government argues, "[t]he 'attenuated basis' exception is, at bottom, the manifestation of the courts' consistent rejection of a 'but for' causation standard in 'fruit of the poisonous tree' doctrine."[265] Instead, as the Defendant notes, courts are directed to employ a standard "more akin to a proximate causation analysis."[266] The government argues that the cellphone merely provided a lead, and that is insufficient under *Smith* to justify suppression at this stage.[267] Mr. Powers argues that *United States v. Johns*[268] is applicable, arguing that when the unlawful search was the "'was the impetus for the chain of events leading to' discovery of the evidence the government seeks to admit, it 'is too closely and inextricably linked to the discovery for the taint to have dissipated.'"[269] This Court does not see a meaningful difference in the statements of law. Both cases use slightly different language to refer to proximate cause. Here, it is both the cause in fact and the foreseeable cause that the discoveries in Janel Davis's cellphone led to the Title III warrant.

As this Court has previously written as to attenuation:

[t]he Supreme Court has directed courts to consider three factors. First, one must determine the temporal proximity between the unconstitutional conduct and the challenged evidence. Stated plainly, the longer the time between the

---

[265] *United States v. Smith*, 155 F.3d 1051, 1060 (9th Cir. 1998).
[266] *Id.* at 1060.
[267] Dkt. 775-1 at 4.
[268] 891 F.2d 243 (9th Cir. 1989).
[269] Dkt. 791-1 at 14 (citing *John*, 891 F.2d at 245).

violation and the discovery of the evidence, the more likely that suppression would not be appropriate. Second, courts are to consider intervening circumstances. Third, and especially pertinent, the purpose and flagrancy of the official misconduct. This final factor addresses the heart of the analysis. After all, the purpose of suppression is not to exonerate a defendant. Instead, it is to deter law enforcement's misconduct. As such, the nature of the misconduct affects whether it is appropriate to punish it.[270]

Here, the temporal proximity weighs marginally, if at all, in the government's favor. While the Title III was sought in February of 2021, about eight months after the May 2020 encounter, this is of little import. First, the Defendant has established that law enforcement had decided that it would eventually seek this warrant shortly after the unlawful discoveries on Ms. Davis's cellphone. Second, as SA Judy testified, Title III warrants require significant diligence before law enforcement would seek one. While it took several months to apply for the search warrant, law enforcement began laying the foundation for it almost immediately after May 6. This Court also notes that it is its experience that delays in action during the summer months are common in Southeast Alaska, as its residents often wish to enjoy the favorable weather and beauty of the region during that time.

As to whether there were intervening circumstances, this Court finds this factor to weigh in favor of the Defendant. While law enforcement observed Mr. Powers through pole camera footage and utilized a confidential source to stage controlled buys, for the reasons stated above, there was a direct causal link between the unlawful discoveries beginning on May 6 and these events. In other words, while there were additional events, there was nothing that *intervened* in the path that was set on May 6. This link was also

---

[270] Dkt. 749 at 45–46 (internal citations omitted.).

foreseeable. Janel Davis was the romantic partner of David Powers, who the government now charges with being the lead of a DTO. Searching her cellphone foreseeably leads to evidence that would compel the government to want to wiretap him. While law enforcement needed to conduct further diligence, it only did so because of the discoveries made.

As to the last factor, the most important in this analysis, this weighs compellingly in Mr. Powers's favor. This Court found, and the government has waived objection to, that "Law Enforcement Repeatedly and Brazenly Violated the Constitution, Evidencing Bad Faith."[271] It concluded, in addition to unlawfully searching Ms. Janel's cellphone without a warrant, that:

> law enforcement violated the Constitution in the following ways: (1) Beck violated Ms. Davis's constitutional right against an unreasonable detention by detaining her without reasonable suspicion; (2) the search of Ms. Davis's person clearly violated *Terry*; and (3) the Cellebrite extraction report did not comport to the scope of the search warrant. It similarly finds that law enforcement separately violated best practices in the following ways: (1) for failure to maintain a chain of custody in a reasonable manner; and (2) for compromising the integrity of the extracted data by searching the iPhone pre-extraction. [It also found] the following disturbing: (1) the sworn statements for the various warrants were littered with inaccuracies; (2) Hoffman's reopening of the Chevy door, permitting rain to get inside the vehicle; (3) counsel's representation that JPD had been difficult during the discovery process towards the Defendant. The inaccuracies were as follows: (1) there was no methamphetamine pipe found on Ms. Davis's person; (2) she did not have a large amount of cash on her person; (3) she was not notably anxious, nor was she rapidly smoking her cigarette; (4) the sworn statement did not reference the window of the vehicle being down during the K-9 sniff; and (5) there is no indication from the record that Ms. Lindoff told Det. Wise that she was there to buy drugs from Ms. Davis.[272]

---

[271] Dkt. 719 at 33.
[272] *Id.* at 33–34.

Further, "[l]aw enforcement's actions throughout this investigation were errant at almost every step[.]"[273]  Suppression is to deter misconduct, and the severity of the misconduct here necessitates the suppression reaching the Title III.

At the heart of this issue is whether the Court can believe the government's ultimate argument that the extensive discoveries made from the cellphone of Janel Davis, the girlfriend of the suspected head of an interstate drug trafficking organization, who herself was described as the "suspected second-in-command[,]"[274] were ultimately not that important to the investigation that began on the date of her unlawful detention.  To accept this position, the Court would need to believe that despite there being zero evidence of any investigation predating the May 6 encounter and no indication that law enforcement had *any* other leads, that there somehow exists an independent source.  The severity of law enforcement's constitutional violations demands a punishment.  Preserving the Title III would send a clear message to JPD that despite multiple egregious violations, which included pre-warrant cellphone searches and blatantly disregarding the scope of an extraction warrant, that they did a satisfactory job.  The Constitution demands more consequence than a few uncomfortable days of testimony.

Law enforcement's actions have upended Mr. Powers's life (and that of Janel Davis, who is perhaps an even greater victim here).  If Mr. Powers must accept that the last four-

---

[273] *Id.* at 25.
[274] Title III at 8.

plus years of his life being subject to federal prosecution was for nothing, so must law enforcement accept that their investigatory efforts were wasted.[275]

### d.    All Evidence Must Be Suppressed.

As written previously, it is the government's burden to show that the evidence that it intends to use at trial is not tainted by the illegal searches. The government only argued that the Title III should not be suppressed. It has not defended any other evidence. Because the government has been given opportunities from Judge Burgess and the undersigned to submit written defenses, and because this Court held a second evidentiary hearing where the government was given further opportunity to defend its evidence, this Court believes that the government has waived any further presentation of evidence. At this point, this Court recommends suppression of the entire investigation, possibly necessitating dismissal of the charges against Mr. Powers.

This Court does not make this recommendation solely based on waiver. Upon independent and brief review of search warrants 1:21-mj-00036, 1:21-mj-00037, 1:21-mj-00038, and 1:21-mj-00040, this Court preliminarily finds that the probable cause that the undersigned relied on was inextricably intertwined with the fruits of the Title III and its extensions. Further, the criminal complaint that the undersigned approved in 1:21-mj-00046, which led to Mr. Powers's arrest (and physical evidence that the government

---

[275] Mr. Powers also argues that the Title III lacks probable cause when excising the illegally obtained information, and he objects (for the first time) to accuracy of several paragraphs. Dkt. 791-1 at 30–34. At this time, this Court finds a *Franks* inquiry into the Title III unnecessary, and it does not analyze whether the Title III was supported by probable cause now because it finds suppression otherwise appropriate.

intends to introduce at trial), appears to be lacking in probable cause, excising the results from May 6, 2020 through the results of the Title III.

This Court recognizes that certain evidence may have been salvageable. For instance, the government *could* have argued that the pole cameras captured only footage outside of Mr. Powers's reasonable expectation of privacy or the extraction of Mr. Bischoff's cellphone is outside of his Fourth Amendment standing. But the government did not make any such argument. The government's right to object includes these materials, and this Court may modify its recommendation upon persuasion. It will not make the government's argument for it, and the evidentiary proceedings are closed.

## VII.    CONCLUSION

For the reasons set forth above, the Motion to Suppress should be **GRANTED** as to Mr. Powers but be **DENIED** as to Mr. Bischoff. 28 U.S.C. § 636(b)(1)(B). The parties have the right to object to this Court's new findings and recommendations.[276] The parties may submit objections to Section VI no later than **September 3, 2025** with replies due **September 10, 2025**. Objections and replies shall not exceed ten pages in length and shall be double-spaced with standard one-inch margins. While this Court appreciates the schedules of the attorneys in this case, due to the Court's calendar and the scheduled trial, extensions to these deadlines will be disfavored.

DATED this 20th day of August, 2025, at Anchorage, Alaska.

_____
MATTHEW M. SCOBLE
CHIEF U.S. MAGISTRATE JUDGE

---

[276] Dkt. 719 at 43–44.